## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| YOKO SAVINO, DO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-02163-TWP-MJD |
| | ) | |
| INDIANA URGENT CARE PHYSICIAN | ) | |
| GROUP, LLC, PREMIER HEALTH | ) | |
| CONSULTANTS, LLC, and INDIANA | ) | |
| UNIVERSITY HEALTH URGENT CARE | ) | |
| CENTERS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Joint Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants Urgent Care Centers Physician Group, LLC ("Physician Group"), Premier Health Consultants, LLC ("Premier"), and Indiana University Health Urgent Care Centers, LLC ("Urgent Care Centers") (collectively, "Defendants") (Filing No. 101). In addition, Plaintiff Yoko Savino ("Savino") has filed a Motion for Leave to File Surreply and Supplemental Designation of Evidence (Filing No. 141.) This action was initiated by Savino following termination of her employment by Defendants. Savino filed this action alleging violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), based on discrimination against her because of her Japanese national origin and retaliation based on her complaints about national origin discrimination and harassment. (Filing No. 1 at 6–7.)  Defendants assert that Savino's claims of discrimination, retaliation, and harassment are wholly unsupported by the record, therefore, they are entitled to judgment as a matter of law on each of the claims. For the following reasons, the Court **grants** Savino's motion (and will consider his surreply) and **grants** the Defendants' Motion.

# I.   BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, they are presented in the light most favorable to Savino as the non-moving party.  *See Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Savino was born in Japan in 1962 and moved to the United States in 1989, becoming a U.S. citizen in 1995. She became a Doctor of Osteopathic Medicine ("D.O.") in 2004 and was board-certified with the American Osteopathic Board of Family Physicians in 2008. Savino began working for Defendants as a D.O. at their urgent care centers across central Indiana in late 2016 (Filing No. 103-33 at 11–12; Filing No. 129-1 at 1; Filing No. 122-3 at 1–2).[1]

When she was hired, Savino received training on Defendants' policies and procedures, including education on cultural competencies, ethics, treatment/clinical guidelines, discrimination/harassment prevention, and communicating professionally in emails (Filing No. 103-33 at 28–30, 90–91).  Before starting her employment, she acknowledged on July 26, 2016, that she received an employee handbook, which noted a mission to "provide an excellent patient care experience" and "a zero-tolerance policy toward discrimination, harassment and retaliation." *Id.* at 92; Filing No. 103-12 at 7, 11. The handbook explained behavioral expectations for employees. It defined (1) "inappropriate behavior" as conduct "that is not suitable for the situation and/or is less than desirable" or "[d]istracts and negatively impacts the quality and safety of all individuals in the healthcare environment" and (2) "disruptive and intolerable behavior" as "[c]onduct by an individual that intimidates others to the extent that quality and safety could be

---

[1] Urgent Care Centers operates the clinics while Physician Group employs physicians to provide services and Premier provides management services, including employing non-physicians (Filing No. 98 at 1).

compromised. The behaviors may be verbal or non-verbal, [and] may involve the use of rude language." (Filing No. 103-12 at 34.)

Throughout her employment, Savino was subject to complaints about her behavior *(see generally* Filing No. 104-1 *passim*; Filing No. 104-2 *passim*).[2] Grievances against Savino, as outlined in more detail below, generally concerned her bedside manner with patients and her adverse interactions with coworkers. *See infra* Subsection III.A.2. Correspondingly, Savino received counseling on her conduct. On July 18, 2017, for example, Jason Amich ("Amich"), a regional manager, met with Savino to discuss a complaint that Savino raised her voice at and embarrassed a Black medical assistant (Filing No. 103-34 at 14). Savino, who was "very apologetic," was counseled on interpersonal communications and indicated that she would work to improve her relationship with that coworker. *Id.* After a few more reports of Savino becoming "confrontational" (Filing No. 103-17 at 1) and acting "rude and disrespectful" (Filing No. 103-16 at 1), Savino was scheduled to have another meeting with Amich about, among other things, her interactions with coworkers (Filing No. 103-34 at 14). But before that meeting started on November 20, 2017, Amich witnessed an incident between Savino and a different medical assistant, with Savino interrupting her after she started talking, saying "I am speaking and you should not." *Id.* Amich again advised Savino on the importance of maintaining positive interpersonal relationships in the workplace after this incident. *Id.*

On April 13, 2018, after several more staff complaints—including one where Savino had recently made a derogatory statement about the sexuality of another medical assistant (Filing No. 103-19 at 1)—Amich and Dawn Stuckwisch ("Stuckwisch"), a medical director and Savino's direct

---

[2] As discussed below, Savino, to be sure, has not been the only employee of Defendants to receive complaints. *See infra* Subsections III.A.1.f, III.A.2 (detailing other instances of physician (and non-physician) misconduct and subsequent actions).

supervisor, met with Savino to discuss her behavior (Filing No. 103-34 at 15). Though the origin

of that complaint was not initially disclosed, Savino quickly asked if it was about her sexuality

comments.  *Id.*  Savino indicated her comments were meant to "tease" the medical assistant (Filing

No. 103-33 at 52). She was reminded that she needs to think about the "perception" of her

interactions with others as well as the continued importance of "professional decorum." (Filing

No. 103-34 at 15.)

At this point, Savino was placed on a ninety-day Performance Improvement Plan ("PIP").

*Id.*  In relevant part, the PIP instructed that Savino needed to improve in four areas of concern:

> Professionalism – Accept responsibility for own actions and react well under
> pressure. Communication should always be professional, both with staff and with
> patients and their families. Patience is key. Rudeness, curtness, and sarcasm is
> never acceptable whether it's with a patient or staff member. Please always keep
> perspective and cultural awareness in mind, as what you might think is funny may
> be perceived as highly offensive to the person on the receiving end.

> Customer Service – The Company is committed to providing excellent customer
> service and developing a service-oriented organization. Physicians must work to
> resolve patient complaints successfully with the goal to maintain patient retention,
> loyalty, and word of mouth referrals. We will closely monitor patient satisfaction
> and survey scores for the next ninety days.

> Teamwork – Take initiative to have a "do what it takes" mentality. This might mean
> performing duties not specifically covered in your job description.

> Company Policy & Procedures – Familiarize yourself with the Company's policies
> and procedures as well as the mission of the Company. Keep a positive attitude and
> always portray the Company in a positive manner.

(Filing No. 103-3 at 1–2.)  The PIP explained that it was Savino's responsibility "alone" to address

these concerns, that review could occur as often as necessary, and that corrective actions—

including termination—could be taken during or after the PIP's implementation.  *Id.*

Also at that April 13, 2018 meeting, Savino indicated that because she felt like "a

minority"—since she was a D.O. (instead of a Doctor of Medicine or "M.D."), since she was a

woman, and since she spoke with an accent—she would not want to treat anyone negatively (Filing

No. 103-34 at 15).  Savino reported that felt like she was sometimes being made fun of at work. *Id.* Amich and Stuckwisch verbalized their disapproval of these difficulties and requested more details from Savino.  *Id.*  As for other generalized feelings of being "made fun of," Savino later said that she never heard anti-Japanese sentiment from any coworker (Filing No. 103-33 at 46–47).

On April 15, Savino, through email, informed Amich and Stuckwisch that she did not want to be scheduled to work at a particular location alongside a certain medical assistant because she "should not be a victim of abuse or harassment." (Filing No. 103-20 at 1.) In a later email, Savino stated that this medical assistant engaged in insubordination and underperformance, including exchanges where (1) the two disputed whether a mother should have brought her child into the urgent care center, (2) the medical assistant told Savino that she "cannot order any test today" and questioned her ordering of a tetanus shot and sarcastically asked when she went to medical school, (3) the medical assistant hinted that Savino should not come to work at a particular location where she would be working, and (4) the medical assistant again questioned an action Savino took and when Savino told the medical assistant that she should seek assistance if she had a question, and the medical assistant responded "I'm leaving!!!!" (Filing No. 103-21 at 1–2; Filing No. 103-22 at 1; Filing No. 103-23 at 1–2). Though Savino indicated that she felt like she was being subjected to "abuse/harassment" from the medical assistant (Filing No. 103-23 at 2), she did not indicate that she believed her race or national origin played any role in the conduct; instead, she attributed it to the fact that "we all work hard and sometimes get frustrated." *Id.* at 1. After Amich investigated the matter and discussed the situation with the medical assistant (who took the conversation "seriously" and "assured" Amich that she "like[d]" Savino and "enjoy[ed] working with" her) (Filing No. 103-24 at 1), Savino reported no further issues.

During the ninety-day PIP period, Defendants received two professionalism complaints about Savino: one from a coworker and one from a patient.  In the employee complaint, a medical assistant (who had earlier had an issue with Savino) indicated on April 30, 2018, that "effective immediately", she refused to work with Savino because Savino had "insulted [her] verbally several times while working." (Filing No. 103-25 at 1.) A later clarifying email explained that Savino spoke to her in a "very condescending and insulting" way and that Savino called her a "Brown Noser" for cleaning the clinic (Filing No. 103-27 at 1).  Savino also repeatedly called the medical assistant's name as she was on the telephone with a patient and later told her in a "mean way" that she needed to pay more attention.  *Id.*  Savino also sarcastically said that she was "not as perfect as" the medical assistant. *Id.* Two witnesses later confirmed the incident, stating that Savino's actions were "uncalled for" and that she had been "yelling" or "basically yelling" and "talking down" to the medical assistant (Filing No. 103-29 at 1; Filing No. 103-30 at 1).  For her part, Savino stated that she was "just joking." (Filing No. 103-27 at 1.)  Savino later, however, emailed Stuckwisch in her own defense, stating that if she "borrowed [the medical assistant's] level of sensitivity," it could be construed as "an attack against minority." (Filing No. 103-28 at 1.) She acknowledged, though, that the medical assistant seemed frustrated that she could no longer study at work. *Id.* Later still, Savino sent a friend a series of text messages, stating that she had upset a "typical white middle-aged good house wife type" and that in her email she had "used 'race card' lol." (Filing No. 103-38 at 1.)  As for the patient complaint received during the PIP, an "unhappy" patient indicated on July 1, 2018, that Savino did not "seem to take my concerns seriously," appeared more interested in "getting me out the door quickly than lowering my pain level," and did not "listen[] to my issues." (Filing No. 104-3 at 2–4.)

Citing Savino's lack of improvement under the PIP and the continued complaints against her, Melissa Cash ("Cash") (who had replaced Amich as regional manager) and Stuckwisch met with Savino and terminated her employment effective July 17, 2018 (Filing No. 103-33 at 84–85; Filing No. 103-31 at 1–2). This termination decision was earlier made by Cash, Stuckwisch, Mark Reddinger ("Reddinger") (Physician Group's Chief Operating Officer and Stuckwisch's direct supervisor), and Sara Laiche ("Laiche") (Vice President of Premier's Human Resources) because of Savino's performance and professionalism issues (Filing No. 103-35 at 9, 16; Filing No. 103-36 at 5–6; Filing No. 103-37 at 9–10).[3]   Months after Savino was terminated, Defendants received another complaint against her, this time for her "rude" and "discriminat[ory]" treatment of a patient because of "his sexual orientation" in June 2018 (Filing No. 104-4 at 2). Eventually, Savino initiated this suit against Defendants for discrimination and retaliation in violation of Title VII (Filing No. 1 at 6–7). Defendants seek summary judgment under Federal Rule of Civil Procedure 56.

## II.   LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v.*

---

[3] Those involved in the termination decision had varying views on whether they believed Savino was originally from the United States or spoke with an accent. Though Stuckwisch thought Savino spoke with an accent and had Asian features (Filing No. 129-11 at 14), Cash claimed she did not know Savino "was of any other heritage than American" (Filing No. 129-5 at 3), and Cash, Amich, and Reddinger did not believe Savino spoke with any accent. *Id.*; Filing No. 129-3 at 5–6; Filing No. 129-9 at 9–12, 17.

*Quotesmith.Com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## III.   DISCUSSION

Savino brings two claims under Title VII: one for discrimination and another for retaliation. Defendants seek judgment as a matter of law, asserting that Savino was not discriminated against or subjected to a hostile work environment while employed by Physician Group, rather, her termination occurred because her unprofessional behavior was not corrected despite counseling and enrollment in a Performance Improvement Plan. The Court will address these claims in turn. As an initial matter, Savino also moves for leave to file a surreply (Filing No. 141). Following review of her arguments, the Court determines it will **grant** this Motion and will consider the contentions contained within that brief (Filing No. 141-1).

## A.  <u>Discrimination</u>

Savino alleges that, in violation of Title VII, she was discriminated against because of her

Japanese national origin (*see* Filing No. 1 at 6). The Seventh Circuit has instructed that

> Title VII prohibits an employer from "discriminat[ing] against any individual with
> respect to his compensation, terms, conditions, or privileges of employment,
> because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.
> § 2000e-2(a)(1). In discrimination cases, "[w]hen a defendant moves for summary
> judgment, the 'singular question' for the district court is whether the plaintiff has
> introduced evidence that would 'permit a reasonable factfinder to conclude that the
> plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the
> discharge or other adverse employment action.'" *Purtue v. Wisconsin Dep't of
> Corr.*, 963 F.3d 598, 602 (7th Cir.), reh'g denied (July 31, 2020) (quoting *Johnson
> v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)). Whether a
> plaintiff offers direct or circumstantial evidence of discrimination, this court made
> clear in *Ortiz v. Werner Enters., Inc.* that "all evidence belongs in a single pile and
> must be evaluated as a whole." 834 F.3d 760, 766 (7th Cir. 2016).

*Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). Broadly speaking,

a court may examine these types of cases using two (albeit related) methods: "first, the *McDonnell

Douglas* framework and, second, the holistic approach under *Ortiz*." *Tyburski v. City of Chicago*,

964 F.3d 590, 598 (7th Cir. 2020). Though Defendants argue at length in their lead brief that she

fails to establish her case under *McDonnell Douglas*, Savino decides to proceed under the broader

examination of *Ortiz*. (*See* Filing No. 121 at 22 ).[4]  As plaintiff, Savino can choose the method she

will use to attempt to prove her claim. Accordingly, the Court will discuss the case under *Ortiz*'s

holistic approach. As described in *Igasaki*,

> [a]t summary judgment, "[w]hat matters is whether [a plaintiff] presented enough
> evidence to allow the jury to find in [his] favor." *Vega v. Chicago Park Dist.*, 954
> F.3d 996, 1004 (7th Cir. 2020). . . . The determinative question in discrimination

---

[4] Curiously, Savino argues in her surreply brief that she established a *prima facie* case under *McDonnell Douglas* in
her response brief. *See* Filing No. 141-1 at 3 ("Savino devoted an entire section to a discussion of similarly situated
individuals; specifically argued that Defendants' expectations were not legitimate because Savino received no
feedback, no performance metrics, no training, and dishonest feedback on her progress under the PIP and thus were
not objectively reasonable or adequately communicated to Savino; and provided a thorough analysis as to why
Defendants' asserted reasons for terminating Savino did not represent the truth, even though a showing of pretext was
not required unless she was solely relying on *McDonnell Douglas*.") (citations omitted). It is clear, however, that she
does not rely on this framework to prove her claim.

cases is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. Under *Ortiz*, we therefore ask whether the totality of the evidence shows discrimination, eschewing any framework or formula. *Id.*

988 F.3d at 957–58.

Defendants argue that Savino's consistently unprofessional behavior dooms her claim under this comprehensive examination:

Savino had recurring problems getting along with those she worked with, would argue with medical staff rather than professionally handling performance issues, and she did not provide the level of customer service to patients that Defendants reasonably expected, based on recurring patient complaints. Savino's performance issues continued after she was informally counseled and formally counseled through a PIP. Savino was terminated for her own misconduct, which violated Defendants' policies and legitimate performance expectations for a physician. Defendant has consistently used similar procedures with other physicians, and has terminated at least one other non-Japanese physician who engaged in similar behaviors.

(Filing No. 102 at 28.) In light of these facts, Defendants contend that Savino's mere "speculation," that "multiple medical staff members and patients" targeted her because of her national origin does not "create a question of fact on summary judgment." *Id.*

Savino responds that "considering the amalgamation of circumstantial evidence, a reasonable jury could readily find that the termination of Savino's employment was based at least in part on Savino's national origin." (Filing No. 121 at 22.) Because Savino arranges her evidence into six groups, the Court will also organize its evaluation of her arguments around these categories before concluding with the holistic inquiry contemplated by *Ortiz*.

1.   **Savino's Argument**

   a.   **Surreptitious plan to terminate**

First, Savino contends that "Stuckwisch, Amich, and Reddinger surreptitiously planned to terminate Savino's employment regardless of any improvement in her performance." *Id.* at 23.  In

fact, these individuals "expected Savino to figure out any issues with patient or staff complaints on her own" and even admitted that Savino was to be "replaced" before "the issues leading to the PIP were even known" to them. *Id.* (cleaned up). And during the PIP meeting, Stuckwisch told Savino that the incident stemming from her comment about a coworker's sexuality had been merely a "blip," which was far from telling her that "her employment was in jeopardy." *Id.* Indeed, while Savino was apparently strung along about her continued employment—even despite inquiring about a diminishing number of shifts—without "any indication her performance had been deemed inadequate under the PIP," the decision to "pull the trigger" on terminating Savino was made by at least June 22, 2018. Savino points out that this date was well before the expiration of the ninety-day PIP on July 12, 2018. *Id.* at 23–24. And "[t]he PIP had no metrics, no training, or any means to measure Savino's continued performance." *Id.* at 24. Thus, "[t]he subterfuge involved in the termination of Savino's employment is highly suspect." *Id.*

Defendants reply that Savino has not offered evidence of any comments or conduct suggesting an inference of discrimination stemming from supposedly suspicious conduct (Filing No. 139 at 6). First, "Savino knew about the patient complaints that were processed before her termination," and Defendants "did not deceive Savino about the severity of her performance issues." *Id.* at 7. Moreover, "any suggestion that Stuckwisch should have informed Savino of another informal patient complaint BEFORE it was processed is unsupported" when no evidence shows that "Defendants ever provided providers with information about complaints before they were processed." *Id.* (Emphasis in original.) Defendants argue that no single complaint caused Savino's termination: rather, she "was terminated for a continuing pattern of unprofessionalism." *Id.* Further, "Savino knew that employees had made complaints against her because Defendants communicated with Savino about these complaints, before the PIP was put in place, on the date

the PIP was put in place, and during the PIP period." *Id.* Additionally, "the PIP itself outlined areas Savino needed to improve and unambiguously stated that termination was possible if Savino did not improve in those areas, as well as the fact that she remained an at-will employee and was not guaranteed employment for any particular period." *Id.* at 8. In other words, any contention that Savino was left in the dark about her performance issues rings hollow. *Id.* Finally, Defendants contend that Savino (while misstating the record) omits that pre-PIP shift changes stemmed from a planned "change in staffing model for financial reasons" that could have affected several providers. *Id.* at 9.

In her response, Savino states that her "point was not that she was actually being 'offered fewer shifts' but that Stuckwisch withheld almost the entirety of her feedback about Savino rather than discussing Savino's alleged performance deficiencies with her." (Filing No. 141-1 at 12.) She asserts that if Defendants wanted her to improve her performance the logical and necessary action would be to inform her about such deficiencies. *Id.* at 13. Absent follow-up from Defendants, "Savino had no way to know Defendants perceived any performance deficiencies". *Id.*

### b. Inconsistent and contradictory statements

Second, Savino contends that "Amich, Stuckwisch, Reddinger, and Cash told very different stories on when a termination decision was reached." (Filing No. 121 at 24.) Cash and Stuckwisch, for example, "contend the termination decision occurred on July 9, 2018," while Reddinger "admitted the decision had been reached weeks before that on June 22, 2018." *Id.* at 24–25. Savino maintains that her termination had been planned since "as early as February 2018, before the patient and staff complaints that Stuckwisch and Cash claim resulted in Savino's termination." *Id.* at 25. On top of these conflicting dates, Amich, Stuckwisch, and Reddinger do not even agree "on who decided to terminate Savino's employment." *Id.* ("Cash claimed it was Stuckwisch, 'the medical director.' Stuckwisch asserted it was a 'collaborative decision' between Reddinger, Cash,

and Stuckwisch. Reddinger claimed it was the 'Board of Directors, Medical Director, Human Resources,' and 'Regional Administrator.'") (citations omitted). Savino asserts that these inconsistencies demonstrate potentially dishonest justifications for her termination. *Id.*

Defendants reply that the record does not support these claims, and "Savino does not establish Defendants had a 'dishonest' justification for Savino's termination." (Filing No. 139 at 11.) First, Stuckwisch, Reddinger, and Cash did not offer "inconsistent explanations" for Savino's termination when they all cited her performance and professionalism issues as the root for that employment action. *Id.* at 11–12. Rather, Reddinger cited "[p]erformance issues as well as human resources related issues," such as patient and staff complaints. *Id.* Cash similarly cited more consistent complaints' from patients concerning unprofessionalism and bedside manner. *Id.* Dr. Stuckwisch unambiguously testified, "Savino was terminated because of persistent issues with clinical performance and professionalism." *Id.* In addition, Stuckwisch later discussed concerns she had that Savino had issues with documentation and coding as well as seeing patients too quickly, before confirming her reason for supporting the termination was "[p]atient complaints, documentations, and professionalism." *Id.* Defendant assert that, "[e]ach individual's reason is entirely consistent with each other, with the PIP Savino was given, and with the reason stated during her termination meeting." *Id.* at 12.

Moreover, Defendants continue, "there is no inconsistency in testimony about who participated in the decision to terminate." *Id.* In fact, all evidence "is consistent with business reality that such decisions commonly involve input from various departments, levels of management and HR." *Id.* Specifically here, "Reddinger, Stuckwisch, and Cash all agreed they played a role in the [unanimous] termination decision." *Id.* Additionally, any discrepancy in recollections of an exact date for the termination decision is inconsequential when "Defendants

13

considered whether to terminate Savino over several weeks, when Savino's performance issues continued after the PIP was put in place." *Id.* at 13 (citing *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 881–82 (7th Cir. 2016) ("However, [the Seventh Circuit has] held that where 'there is no conflict in the evidence regarding the reasons for' an adverse employment action, 'differing recollections' of the events surrounding that action 'do not raise a reasonable inference of discrimination.'") (Citation omitted).)  In sum, "Defendants had several communications about the performance issues and practicalities of possibly moving forward with termination." *Id.*

### c.   <u>Suspect reasons for termination</u>

Savino argues that "a reasonable jury could conclude the stated reasons for Savino's termination were suspect" because of "differing and inconsistent explanations." (<u>Filing No. 121 at 25</u>.) Savino first contends that it "is suspect" that she "never received anything in writing describing the reasons for her termination," violating standard procedures. *Id.* Moreover, no one tells the same story related to Savino's termination and "Stuckwisch, Amich, and Reddinger offer three different stories related to the basis for terminating Savino's employment." *Id.* at 26. For example;

- Reddinger claimed Savino was terminated because of "[p]erformance issues as well as human resources related issues," such as patient and staff complaints.
- Cash claimed "more consistent complaints" from patients concerning 'unprofessionalism and bedside manner' arose.
-  Stuckwisch claimed Savino had issues with "documentation and coding" as well as "inappropriate volume at the clinic" (i.e., seeing patients too quickly)."

*Id.*

Additionally, "[t]hree final patient complaints that supposedly contributed to Savino's termination were incredible or withheld from Savino." *Id.* at 27. Specifically, one complaint was described by Amich as "weird" and contained "inconsistencies" about her communications with

14

Savino. *Id.* Another complaint was not mentioned to Savino after it was received in the seventeen days preceding her termination. *Id.* And despite Stuckwisch receiving that complaint on July 1, 2018, she told another employee that she "received this complaint today" on July 16, 2018. *Id.* Finally, though "Cash claimed that a patient complaint received on July 3, 2018 contributed to Savino's termination," this complaint was "contradictory" both on its face and in Stuckwisch's interpretation. *Id.* at 28. All told, the use of these complaints as "a basis for Savino's termination is suspect and undermines Defendants' reasons for terminating Savino's employment." *Id.*

Defendants reply that it is "not suspicious that Defendants started considering terminating Savino for her professionalism issues during the PIP period" when coworkers, directly after the PIP went into effect, complained that they did not want to work with Savino ([Filing No. 139 at 9](#)–10). At this time, Defendants "reasonably began discussing the possibility of Savino's termination" while investigating the complaints. *Id.* at 10. This, of course, tracked the notice in the PIP that termination was possible during the PIP period. *Id.* Defendants additionally argue that though Savino claims they did not investigate her claims against coworkers, they "did investigate Savino's complaints." *Id.* And despite Savino taking issue with the outcome of those investigations, this suit is not the proper venue to relitigate those grievances. *Id.* Specifically, Defendants spoke with a medical assistant "based on the substance of Savino's complaints," "followed up with Savino via email," and "invited Savino to report any further negative interactions." *Id.* at 11. Savino "did not report any" more incidents. *Id.*

### d.    Feigned ignorance of Savino's Japanese accent and features

Savino maintains that "Reddinger, Amich, and Cash refus[ing] to even acknowledge Savino had an accent or Asian features"—despite Stuckwisch (and others) admitting that "Savino's accent was 'obvious' and admit[ing] Savino had Asian features"—demonstrates "a complete lack

of credibility and a consciousness of guilt." (Filing No. 121 at 29.) Because "credibility determinations" are tasked to a jury, the Court should deny summary judgment on this ground. *Id.*

In reply, Defendants contend that Savino's representation mischaracterizes the testimony. (Filing No. 139 at 13.)  "Reddinger did not 'refuse to acknowledge' anything[;] [he] just did not have any awareness that Savino specifically had Japanese heritage." *Id.*  ("Reddinger said he would [think Savino's heritage was] Asian or Native American.").  As for her speech, Reddinger merely acknowledged that "lots of people talk different ways and it doesn't mean that they're from anywhere on the earth other than from where they're at right now." *Id.* at 14 (citation omitted). Amich, "testified that he does not know what Savino's native language is and that he is not an expert on dialect." *Id.*  He acknowledged, however, "Savino's Japanese heritage." *Id.* Cash denied that Savino's accent was "different than other persons, English speaking persons" and "guessed" that Savino's features were Japanese. *Id.*  To the extent that this testimony is even admissible (Defendants argue it calls on the witnesses to impermissibly "speculate"), Defendants argue that "it could not lead any reasonable jury to infer discrimination took place." *Id.*

Savino responds that acknowledgment of her features and accent is not "speculation" on the part of these individuals—they "were asked about their own perceptions of Savino's accent and features and what their observations were." (Filing No. 141-1 at 5.) None of the questions, Savino contends, asked for any knowledge within her "possession"; instead, they asked "for the particular witness' own awareness or knowledge based on their observations and conversations with Savino." *Id.* at 8.  Moreover, the testimony was not mischaracterized when it was "directly quoted." *Id.*  For example, Reddinger "was given every opportunity to admit Savino had *any* sort of accent, Japanese or otherwise," and "Amich had *multiple* opportunities to identify *any* accent perceived in Savino's communications." *Id.* (emphases in original).

16

### e.  **Complaints' relation to communication issues**

Savino also argues that many of the complaints against her were based on "subjective communication issues," and "Defendants never considered whether these largely subjective issues with Savino's communication related to her national origin." (Filing No. 121 at 29.) In fact, "[m]ultiple staff members felt Savino was being misinterpreted and misunderstood because of her Japanese accent and cultural values." *Id.* This, to Savino, was compounded by the fact that "the interpretation of patient complaints, in particular, was very subjective and subject to bias." *Id.* at 30. In contrast, when Savino brought incidents she experienced with coworkers who "refused to listen to her, questioned her medical judgment, and were otherwise disrespectful to her" to the attention of supervisors, they told her "that no harm was meant by any of the incidents, and no discipline was imposed on the perpetrators." *Id.* Indeed, these incidents were not even investigated, and Savino was expected to "handle" the episodes on her own despite that expectation not applying to other physicians. *Id.* at 30–31. Finally, "many of the employees with whom Savino had difficulty interacting had numerous complaints from other providers or staff." *Id.* at 31. "Savino was assumed to be the unprofessional wrongdoer," despite these other employees having prior complaints against them. *Id.* In sum, "Savino's intent was never taken into account," in contrast to, for example, a Caucasian radiology technician "who was permitted on multiple occasions to *intentionally* make insulting statements regarding staff members' gender identity and sexuality before any actions were taken." *Id.* at 32. (Emphasis in original.)

Defendants reply that these contentions are "not supported by the communications themselves, or Savino's reports about alleged 'harassment', and invite[] impermissible speculation by a jury." (Filing No. 139 at 16.) Even though Savino alleges that she was "made fun of" because of her accent by non-decisionmakers, she never reported this to any of the Defendants. *Id.* at 17. Moreover, no one "complained to Defendants about Savino's accent or national origin, and there

is no basis to conclude that 'rudeness and disrespectfulness' has anything to do with being of Japanese national origin." *Id.* Defendants also contend this argument misses the point: no one alleges that this involves any "miscommunication" at all; rather, "the individuals on the receiving end of Savino's communications fully understood the words that she said." *Id.* "Savino cannot suggest that calling someone a brown noser or commenting on a co-worker's sexuality or arguing with a medical assistant—which Savino admits in material part—is connected to her Japanese heritage or cultural values." *Id.* "This behavior," Defendants contend, "is unprofessional in any culture." *Id.* Defendants point out that the coworkers who indicated that they never saw Savino act unprofessionally only worked with her about ten to fifteen times and merely speculate (through inadmissible hearsay) that *others* misinterpreted Savino because of her accent, national origin, and Japanese culture. *Id.* at 17–18. Savino, however, replies that the statements are not hearsay, and Defendants do not meaningfully identify what statements even consist of hearsay and why they are such. (Filing No. 141-1 at 15–16.) Instead, these declarations come from the "personal observations" made by both coworkers. *Id.* at 16.

### f.    More favorable treatment of multiple non-Japanese providers

Savino contends that "multiple other [non-Japanese] providers were treated far more favorably in the way they were disciplined, the consideration of their patient complaints, and the feedback given during performance improvement plans." (Filing No. 121 at 32.) Indeed, "Savino was not given specific metrics to meet while she was on the 90-day PIP unlike other providers." *Id.* On the other hand, physicians Alicia Yilmaz ("Yilmaz") and Imtiaz Ahmad ("Ahmad"), for example, "were given particular goals and metrics, including assistance with perceived performance deficiencies." *Id.* As for physician Christopher Kimmey ("Kimmey"), Defendants gave him "over one year to improve his performance after a PIP before he was terminated, despite no 'marked' improvement in his behavior during that time." *Id.* at 33 (citation omitted). And any

assertion that Kimmey's behavior temporarily improved is "simply false and contradicted by Defendants' own evidence." *Id.* Indeed, Kimmey—who was "'just an overall not nice person'"—"received 9 complaints in 1 year alone (2016) and 12 total patient complaints," while Savino—who "was a 'caring person' who 'could be fun' and was just sometimes 'high strung, a little vulnerable'"—"received 5 total complaints in 1 year (2017) and as few as 8 total patient complaints before her termination." *Id.* (citations omitted). Regarding Ahmad, he admittedly threatened to 'kill' a patient and her husband. *Id.* "This complaint," of course, "was far more severe than any conduct Savino was accused of, and this occurred after Ahmad received numerous patient complaints and had a verbal altercation with Amich for which Amich initially apologized to Ahmad despite Ahmad yelling at Amich." *Id.* Despite this serious incident, Ahmad—who "has also received 14 patient complaints without being terminated"—"continues to work for Defendants to this day." *Id.* Finally, physician Elizabeth Brater ("Brater") received no discipline or coaching despite receiving "11 patient complaints," with some describing her as "very rude," "judgmental[,] and condescending." *Id.* Overall, a jury should make the "judgment call" on the treatment of Savino when "she was not given a full year to improve her performance, she received fewer or the same number of complaints as three other providers when the termination decision was reached, and Defendants deprived Savino of any honest guidance or feedback on her performance." *Id.* at 34.

Defendants reply that no similarly situated provider was more favorably treated. Specifically, "Ahmad did not engage in similar misconduct" because he "did not engage in any continuing misconduct after his PIP." (Filing No. 139 at 15.) As for Brater, "[t]here is no evidence that other employees complained about Brater, or stated that they refused to work with Brater." *Id.* Additionally, any patient complaints against Brater were not "similar to those against Savino." *Id.* As for the medical assistant Savino called a "brown noser," Defendants "asked two witnesses to

provide a statement about Savino's exchange with" her. *Id.* at 11. Nothing about these investigations "could lead to an inference of discrimination." *Id.* For her part, Yilmaz, unlike Savino, "improved her performance after her PIP." *Id.* at 15. Moreover, Lynn Miller ("Miller") "was a radiology technician," not a provider "subject to the same performance standards as Savino." *Id.* (citing *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009)). In fact, Miller was not subject to the same complaint tracker as Savino. *Id.* at 16. Finally, Kimmey was, like Savino, placed on a PIP, and when his behavior also did not improve, "he was terminated." *Id.* "[T]he company's termination of Dr. Kimmey without further warning when his behavior recurred nearly a year after his PIP shows that the company consistently enforced its expectations without regard to race or national origin." *Id.*

### 2. **Holistic Evaluation**

The Court, under *Ortiz*, must weigh all the evidence to determine whether Savino has demonstrated that she faced discrimination because of her national origin. *Igasaki*, 988 F.3d at 958 ("Under *Ortiz*, we therefore ask whether the totality of the evidence shows discrimination, eschewing any framework or formula."). Defendants maintain that "[t]aking the evidence as a whole, Savino has only offered speculative and/or immaterial evidence that would be insufficient to allow any reasonable jury to find her national origin or race motivated her termination." (Filing No. 139 at 19.) Examining all the evidence, Defendants note that courts can look to "'three broad types of circumstantial evidence' that can support an inference of discrimination: 'ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment.'" *Id.* at 6 (quoting *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 933 (7th Cir. 2020)). Under this tripartite assessment, Defendants conclude that Savino

has not offered evidence of ambiguous or suggestive comments or conduct
supporting an inference of discrimination.  The record shows that she was aware of
her performance issues, especially since she was placed on a PIP and sent emails
"defending herself" when other coworkers complained during the PIP period; there
is nothing suspect about Defendants['] preparation for termination once it became
apparent that her unprofessionalism was continuing after she was given the PIP;
Defendants investigated Savino's complaints and did not substantiate national
origin harassment, but did address her concerns and invited her to share any
ongoing concerns – which she declined to do. Savino also has not presented any
evidence of dishonest employer justifications. Every individual involved in her
termination agreed that the termination for persistent unprofessionalism was
warranted. Savino has not presented evidence showing there is any similarly
situated employee outside the protected class who was treated more favorably.
Finally, the patient and staff complaints against Savino cannot be construed as
related to her accent, culture, race, or national origin.

*Id.* at 18–19. Savino, however, contends that Defendants' use of these categories "ignores the

Seventh Circuit's instruction in *Ortiz* that 'all evidence belongs in a single pile and must be

evaluated as a whole.'"  (Filing No. 141-1 at 2 (quoting 834 F.3d at 766).)

The Court disagrees with Savino that Defendants have impermissibly urged that her

evidence must fit into "precise particular categories of direct and indirect evidence"; rather,

Defendants have sorted all evidence into three groups endorsed by the Seventh Circuit for purposes

of her preferred *Ortiz* evaluation, as opposed to the six categories she picked.  *See Joll*, 953 F.3d

at 933.  Even the *McDonnell Douglas* approach, of course, merely represents a flexible means to

organize and present a discrimination case.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519

(1993) ("The *McDonnell Douglas* methodology was never intended to be rigid, mechanized, or

ritualistic.") (quotation omitted); *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894

(7th Cir. 2018) ("[T]he well-known and oft-used *McDonnell Douglas* framework for evaluating

discrimination remains *an efficient way* to organize, present, and assess evidence in discrimination

cases. There is no magic to this test; it is merely one way of culling the relevant evidence."), 895

(referring to the "framework as an organizational *guide*") (citations omitted) (emphases added).

But no matter how the Court marshals this case, summary judgment is warranted on the claim because evidence demonstrates that Savino's termination was based on a facially non-discriminatory reason: she did not communicate effectively or appropriately in the workplace.  *See Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) ("[N]o matter how we label his evidence, it is not enough to create a triable issue of fact on the question whether he lost his job because of racial discrimination.").  True, a determination about an accent or other communication style rooted in Savino's Japanese heritage leading to her termination is a fact issue outside the Court's decisional function at this juncture. *See Mmubango v. Leavitt*, 428 F. Supp. 2d 833, 838 (N.D. Ill. 2006), *aff'd*, 225 F. App'x 393 (7th Cir. 2007) (citing *Surti v. G.D. Searle & Co.*, 935 F. Supp. 980, 987 (N.D. Ill. 1996)) ("The evaluation of a person's speaking skills is inherently *subjective*.") (emphasis added).  Savino argues that "complaints centered around perceptions that Savino had acted rudely or had not provided sufficient explanations" are issues that "are 'inherently subjective' communication issues that 'could also be reasonably construed as "code" for national origin.'" (Filing No. 121 at 29 (quoting *Artunduaga v. Univ. of Chicago Med. Ctr.*, No. 12 C 8733, 2015 WL 3857333, at *7–8 (N.D. Ill. June 19, 2015)); *see also* Filing No. 141-1 at 17 ("*Artunduaga* is directly applicable to Savino: judgments were based on Savino's national origin, which contributed to the decision to terminate her employment.").)  But Savino's accent and communication style were not at the heart of the grievances against her.

Patient complaints about Savino involved criticism of her blunt and unprofessional bedside manner as well as her inability to address patient concerns in an appropriate way.  For example:

- A parent felt that "her daughter was not cared for appropriately [and] after going back and forth with the provider, an x-ray was performed." (Filing No. 104-1 at 7-8);

- "Patient stated her visit was 'terrible.' She mentioned the doctor did not do an examination on her and would not come close or look at her. . . . She stated the doctor

just kept telling her 'to go to the ER' and would not 'listen to her complaints.'" Filing
No. 104 at 8;

- "The Dr. said that I looked fine and my urine was fine (again she did not culture the
  urine)...She then asked me 'if I have been doing things I shouldn't be doing?' I asked
  her what she meant and she said 'are you using drugs?' I told her no, I have never used
  drugs. She continued to ask me if I was 'doing things I shouldn't be doing like cocaine.'
  I continued to tell her no. She said it sounds like a symptom of cocaine use. She asked
  if I am smoking on birth control. I told her no. She said my chest symptoms sound like
  drug use. I repeated that I am not using drugs. I have never had a Dr. repeatedly question
  me about drug use before..." (Filing No. 104 at 18);

- "They claimed she walked out and they were discharged by the nurse. . . . [P]atient's
  mother, called me yesterday and said she was very unhappy with the care she was given
  by Dr. Savino and felt her daughter was not diagnosed properly." Filing No. 104-2 at
  10;

- "He says Dr. Savino did not exam him or look at the knee but instead said 'I don't think
  it's broke, do you? I don't think we should do an x-ray.' The patient said he told her he
  was there for her advice and if she didn't think so, he would go with whatever she
  thought. . . . He says she told him 'well, I'm not giving you pain meds' and the patient
  says he told her 'I don't want any'. He felt offended and was ready to leave." Filing No.
  104-2 at 14; and

- "Dr. Savino appeared to be more into getting me out the door quickly than lowering
  my pain level. . . . She did not seem to take my concerns seriously. . . . I do not feel like
  she listened to my issues, tried to understand my pain level or help me lower my pain
  level. . . . Bottom line is I am unhappy with the level of care I received from Dr. Yoko
  Savino." Filing No. 104-3 at 3–4.

Staff complaints were similarly rooted, also implicating uncomfortable interactions

centered around Savino's less-than-tactful methods, for example:

- describing an "altercation" between Savino and an x-ray technician. Filing No. 103-13
  at 1;

- conveying, in an email with the subject line "An unpleasant incident," that "Savino
  flipped out" on a coworker and talked to her "like she was stupid"; the coworker, "as a
  human being," "does not deserve to be treated like that". Filing No. 103-14 at 1;

- "I am experiencing levels of being uncomfortable while at work with Dr Savino. . . . I
  don't like how she talks about the patients (everyone is seeking drugs)" and "I don't like
  how she talks to me, . . . if I have a question she talks to me as if I'm stupid and . . . she
  raises her voice, and is visibly upset for no reason. She continues to embarrass me and
  I want to keep working here at this location but not with her." Filing No. 103-15 at 1;

- describing that Savino "has slammed the door a few times" and was "confrontational" and "very rude and came real close to me." Filing No. 103-17 at 1;

- Savino "has repeatedly tried to engage me in conversation that I feel is very unprofessional.  She has made racial comments to me about other co-workers" and had "aggressively approached me." Filing No. 103-18;

- Savino "made a derogatory statement regarding my sexuality. . . . I prefer not to work with Dr Savino as she has made my work environment both intimidating and hostile." Filing No. 103-19 at 1;

- "I am tired of the banter of Savino with me and other employees. In the past two days she has insulted me verbally several times while working.  Effective immediately, I will not work with her.  I understand if you need to take me off all schedules completely, but I come to work and do my job and apply myself 100%." Filing No. 103-27 at 2; and

- describing Savino as "rude and disrespectful" and noting that "[w]e always get complaints from patients" about her[5] Filing No. 122-13 at 1.

Considering this designated evidence, a rational factfinder could not find that Savino's national origin was the basis of complaints against her when she regularly communicated in rude and inappropriate ways, undermining Defendants' mission to "provide an excellent patient care experience." *See Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008) (affirming grant of summary judgment on plaintiff's race discrimination claim when the evidence showed that the employer's reason for suspending the plaintiff was due to her "insubordinate, disorderly and rude conduct," and the plaintiff offered nothing other than "her belief" that the reason was pretextual); *Fane v. Locke Reynolds*, 480 F.3d 534, 541 (7th Cir. 2007) (same when employee was terminated for "rude behavior, insubordination, and not recognizing her own inappropriate behavior"). The Court recognizes that in *Artunduaga*—Savino's keystone case on this issue—the court tapped a jury to

---

[5] Savino argues that this last complaint should be discounted because it "was not genuine," was "made in retaliation for Savino's own complaints," and was lodged by a "common complainer" with whom many others in the workplace took issue (Filing No. 141-1 at 10; *see also* Filing No. 121 at 7–8). But because it is but one complaint in a swarm of grievances, even removing it from consideration does not affect the Court's analysis.

decide "whether Plaintiff's accent undermined her job performance" and to determine "the meaning of Defendant's complaints about Plaintiff's 'communication issues,'" which were premised on the plaintiff's grasp of English. 2015 WL 3857333, at *8.[6] However, here, the complaints against Savino were based on the content and tone of Savino's messages, not her accent or any struggle with language. See *Cf. Nayak v. St. Vincent Hosp. & Health Care Ctr., Inc.*, No. 1:12-CV-00817-RLY-DM, 2014 WL 2179277, at *12 (S.D. Ind. May 22, 2014) ("At most, she has presented evidence of a possible cultural divide between American and Indian styles of communication and hospital norms, like working as 'team,' and her alleged inability to accept feedback from fellow residents. That is not, however, evidence of intentional discrimination.").

Although Savino states that some coworkers "made fun of" her for her accent (Filing No. 121 at 9–11), she did not report these instances at the time, and none of these coworkers were involved in the decision to terminate her employment. Accepting the evidence in the light most favorable to Savino, the Court considers (without deciding any hearsay issue) that some coworkers felt that others challenged Savino's medical judgment and were "sassy" or "disrespectful" toward her, as well as that she was not "any more rude" than other employees (*see* Filing No. 141-1 at 16; Filing No. 121 at 7). But these two accounts do not negate the raft of complaints lodged against Savino and do not, in and of themselves, evince discriminatory animus on the part of coworkers, let alone decisionmakers. *See Brewer v. Bd. of Trustees of Univ. of IL*, 479 F.3d 908, 917 (7th Cir. 2007) ("For a nominal non-decision-maker's influence to put an employer in violation of Title VII, the employee must possess so much influence as to basically be herself the true functional decision-maker.")

---

[6] The court in *Artunduaga* also separately evaluated "supposed performance problems [with the plaintiff's] 'cultural background.'" 2015 WL 3857333, at *8. This included examining, among other more-innocuous comments, "disparaging references to Plaintiff's 'culture' and 'country'" by supervisors. *Id.* All together, these "negative references [were] precisely the kinds of ambiguous statements from which a jury could infer discrimination." *Id.*

As for Savino's contention that decisionmakers "feigned" ignorance of her national origin or accent, their statements merely represent that they did not wish to speculate to any provenance of her heritage or accent (*see* Filing No. 129-5 at 3; Filing No. 129-3 at 5–6; Filing No. 129-9 at 9–12, 17).  This does not create an inference of discrimination.

Savino argues that other non-Japanese employees were treated more favorably than she was when facing discipline, however, distinctions apply to everyone she implicates.  *See Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 809 (7th Cir. 2014) ("A similarly situated employee is one whose performance, qualifications, and conduct are comparable in all material respects.") (quotation omitted).  First, non-physicians—like Miller, a radiology technician—are inappropriate comparators to a physician in relation to patient and coworker interactions.  *See, e.g.*, *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (a receptionist and a supervisor were not similarly situated to the plaintiff, a program manager who was fired for performance reasons); *Fuqua v. Brennan*, 645 F. App'x 519, 523 (7th Cir. 2016) ("Fuqua has not explained how junior, part-time flexible mail handlers are similarly situated to him—a senior, full-time mail handler.").

Second, no physician was similarly situated to Savino in conduct before, during, or after periods of probation or PIPs.  "To show that co-workers are similarly situated, . . . [a plaintiff must] show that [s]he and an alleged comparator engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Tank*, 758 F.3d at 808 (quotation omitted).  Unlike Savino, physician Yilmaz received no complaints about her professionalism or treatment during her term of probation (*see generally* Filing No. 104-5 *passim* (showing no complaints against Yilmaz)).  Unlike Savino, Ahmad did not receive additional complaints while placed on his PIP and did not receive any continued

complaints from coworkers (*see* Filing No. 129-11 at 15 ("Q: Were there any other complaints about Dr. Ahmad's unprofessionalism? A: Not that I know of.")).   Unlike Savino, Brater received no complaints from coworkers (*see generally* Filing No. 104-2 *passim* (exhibiting *patient* complaints)). Unlike Savino, Yilmaz actually improved under the PIP (*see* Filing No. 140-3 at 4 ("After 90 days we—[Yilmaz] came out very, very good.  I remember that specifically. She—she—she excelled in customer service, patient care, documentation, billing, coding. I mean, I—I specifically remember Dr. Yilmaz coming out in a very good way after the PIP.")).

While Savino emphasizes the number of complaints each provider received over time (*see* Filing No. 141-1 at 4 ("The number of patient complaints here is a material fact in dispute because Savino's number and frequency of patient complaints was unquestionably one of the primary bases offered for Savino's termination.")), the sum of complaints lodged does not inevitably correlate to behavioral severity or repetition of pre-existing concerning conduct. And though Savino also contends that the improper "count" and "category" of complaints against her in a tracker were related to her termination (*see* Filing No. 121 at 4–5, 4 n.2), as discussed, the aggregate *substance* of the complaints against Savino were considered in the termination decision.

As for Kimmey—the closest analogue Savino has in terms of similarities in position and behavior—he was eventually terminated too. Savino contends that Kimmey was given longer to improve his behavior than she was, and that his "misbehavior continued through the period of the PIP" (*see* Filing No. 141-1 at 11–12). However, the designated evidence does not demonstrate that he exhibited ongoing or worsening performance issues *during* his PIP period; rather, evidence shows that he had made "[n]o marked improvement" during this time (Filing No. 103-10 at 1). Thereafter, Kimmey was terminated when his behavioral issues became "more severe" a year after his PIP expired.  *Id.*  Thus, in some ways Kimmey was like Savino (similar misconduct), but in

27

others, he was different (timing of his backsliding behavior) (*see* Filing No. 141-1 at 11 ("Defendants cannot use Kimmey as a comparator to Savino when they believed it suited them and then disavow their own identification of Kimmey as a comparator" later.)).   If anything, the termination of Kimmey—a white man of non-Japanese descent—supports Defendants' position that physicians were figures with heightened professionalism expectations in their interactions with both patients and coworkers (*see generally* Filing No. 141-1 at 10 (discussing supposedly inconsistent standards for physicians tendered by Defendants); Filing No. 121 at 10 n.5).

Finally, Savino contends that Defendants decided to terminate her in advance and suspiciously offer conflicting accounts of the termination decision, *id.* at 14–18. Defendants persuasively argue that this personnel decision, like many, was made through "several communications" and "over several weeks." (Filing No. 139 at 13.) Different recollections of these events do not create an inference of discrimination based on Savino's national origin. *See Bagwe*, 811 F.3d at 882 ("Here, the decisionmakers at Sedgwick have provided a consistent *rationale* for Ms. Bagwe's termination: she demonstrated ineffective leadership skills. Their differing recollections over exactly who spoke with whom do not call that rationale into question.").

After closely examining the evidence as a whole per *Ortiz*, the Court determines that a jury could not conclude that the internal and external complaints about Savino's unprofessionalism or her resultant PIP and ultimate termination impermissibly stemmed from discrimination based on her national origin.[7] The Court acknowledges that Savino received praise from some coworkers and patients during her employment (*see* Filing No. 121 at 5–7), and she contends coworkers with whom she conflicted received lesser scrutiny than she did, *id.* at 7–12. She also argues that

---

[7] Even if the Court were examining this case under *McDonnell Douglas*, Savino's claim would still fail because she was not meeting Defendants' legitimate expectations. *See Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1180 (7th Cir. 1997) ("[S]hould the plaintiff," under *McDonnell Douglas*, fail "to show that he was meeting his employer's bona fide expectations, there is no occasion to go further.").

Defendants did not "obtain[] her side of the story" concerning complaints against her, *id.* at 13–14.  But this Court "does not sit as a super-personnel department, second-guessing an employer's legitimate concerns about an employee's performance." *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 680 (7th Cir. 2015) (quotation omitted); *see also Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 738 (7th Cir. 2011) ("We have said in substance more times than we can count that when an employer articulates a plausible, legal reason for discharging the plaintiff, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.") (quotation omitted).

Accordingly, the Court **grants** the summary judgment as to Savino's discrimination claim.

## B.   <u>Retaliation</u>

Savino also alleges retaliation under Title VII, arguing that she was terminated from her employment because she engaged in protected activity (Filing No. 1 at 6–7).  The Court can quickly dispose of this claim: as established at length above, Defendants terminated Savino because of her inappropriate workplace behavior both with patients and coworkers. Accordingly, absent a causal connection between this adverse employment action and any alleged engagement in a protected activity, Savino's claim must fail.  *See Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (to establish a causal connection, a plaintiff must demonstrate that the defendant "would not have taken the adverse . . . action but for [her] protected activity") (citations omitted); *see also Moultrie v. Penn Aluminum Int'l, LLC*, 766 F.3d 747, 755 (7th Cir. 2014) (affirming summary judgment on retaliation claim when, "as we discussed in analyzing his discrimination claims, his on-the-job performance was seriously inadequate").  The Court **grants** summary judgment as to this claim as well.

29

## IV.    <u>CONCLUSION</u>

For the reasons discussed above, the Court **GRANTS** Defendants' Motion for Summary Judgment (Filing No. 101).  The Court also **GRANTS** Savino's Motion for Leave to File Surreply and Supplemental Designation of Evidence (Filing No. 141). The other pending motions, accordingly, are **DENIED as moot** (Filing No. 149), (Filing No. 159), (Filing No. 164).

Final Judgment will issue by separate order.

**SO ORDERED.**

Date:  7/30/2021

DISTRIBUTION:

Courtney E. Endwright
BETZ & BLEVINS
cendwright@betzadvocates.com

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Katherine Lee English
HOOVER HULL TURNER LLP
kenglish@hooverhullturner.com

Laurie E. Martin
HOOVER HULL TURNER LLP
lmartin@hooverhullturner.com

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana